at all. We have the Department of Justice, Mr. Brown, is in the courtroom. And we have by phone, on the connection, Mr. Gent, Mr. Kelleher, Mr. Duke, and Mr. Cohn. Is that correct? We're here. Oh, you're there. Okay. On the phone is, excuse me, is that Mr. Duke? That's correct. Okay. Now I got it straight. Sorry. So we will proceed. As I understand it, Mr. Kelleher is not going to present argument or... My argument might break, but I don't, frankly, see any blatant... All right, fine. So that the remaining individuals who intend to argue will have agreed on a division of time, more or less? Yes, Your Honor. Both Mr. Gent and I are going to talk more about the communications between our respective clients. Mr. Duke, I believe, is the only individual that's going to be addressing blatant issues. Okay. So we will proceed. Who's going first, Mr. Gent? Mr. Duke is going first. Okay. Sorry. I think I drew the short straw, but nevertheless, this is David Duke, and I am appearing on behalf of Pedro Carrasco. I have filed a supplemental brief due to the Blakely case, but the fact of this case is that Pedro Carrasco was charged as part of the indictment. He was charged with conspiracy to distribute more than 500 grams. He disagreed with that and disagreed with the theory of the government. His theory at trial was that the drugs that he possessed were for personal use. After a five-day trial, the jury does come back with a special verdict form. The special verdict form does show that the jury thought that Pedro was responsible for less than 50 grams of methamphetamine. The judge set up a sentencing schedule. They did a pre-sentence report. At the time of sentencing, we appeared, and the government put on the probation officer, a Marcy Zink, and Ms. Zink proceeds to go through the discovery, and in the discovery, there's FBI 302s and synopses of various people's testimony. At the end of that, the judge decides that Pedro Carrasco is responsible for 141 grams, placing him in a much higher drug-level offense, and we objected to the use of various levels of hearsay that Marcy Zink used to arrive at that. In the meantime, the United States Supreme Court has come down with a Blakeley decision, and we feel that the Blakeley decision squarely covers Pedro's position and should dictate the outcome to this case. He did take his case to the jury. The jury has spoken. The jury found he's responsible for less than 50 grams. We know that the Ninth Circuit has also issued this decision, and Ameline has shown that, or came to the conclusion, that Blakeley does apply to the United States sentencing guidelines. And therefore, based on that, we'd ask that the court remand this case, or Pedro's case, back to the district court for sentencing of less than 50 grams, and if this particular panel agrees with that position, then I believe that the rest of my arguments in the original opening brief are moot. If the panel does not feel that way, then I am prepared to argue those points in my opening brief. Can I ask a question? Sure. Mr. Duke, this is Judge Tashima. Don't you think it'd be better if we deferred submission of your case until after the Supreme Court has decided the two cases on which it's granted cert on the Blakeley issue? And then maybe, if necessary, give the parties the opportunity for supplemental briefing? Well, I do think that that makes a lot of sense. And I guess, depending on how the United States Supreme Court comes down on that issue, if they decide that, obviously, if Blakeley doesn't apply, then I guess I can come back and argue these other points that are on my brief. That's what I meant by maybe the necessity of further briefing. We don't know what the Supreme Court's going to do, although I'm sure each of us has our own suspicions. I see. Well, let me – this is Judge Schroeder. Don't you have issues on the merits of the conviction? I do not. You do not. I do not. My arguments are sentencing arguments. Well – And the calculation of drugs. I'm – okay. We could also remand to the – rather than deferring submission, we could also remand – well – okay, I'll have to give some thought to this. Along that line, let me ask a supplemental question. If your position is correct, you know, that the enhancement should not have been added?  And Carrasco should have been sentenced for less than 50 grams? Yes. What would his sentence have been? Well, that places him in a category right close to five years, but not quite five years. He's been in there for more than two years, so I think your question is getting on how long can he wait and would he be entitled to be released? That's right. And I do not think he would be entitled to release for another year and a half if he's granted this relief. Okay, that's helpful. Thank you very much. Okay. All right. That's it. All right. Then who's going next? I can go next, Your Honor, on Mr. Cohn or Ms. Duque-Torres. Okay, Mr. Cohn. You may proceed. Thank you, ma'am. I am not presenting any Blakely issues before the Court. No. You represent which defendant? Maria Duque-Torres. Yes, please. I think she's the last listed on the second-to-last, I'm sorry. Right. And she does appeal her conviction. She does. There aren't any Blakely issues in her case. There was a finding of below 50 grams, and the Court did not jump that in her case. If it may please the Court, my issues deal with certain communications that were admitted between my client and her husband, who is represented by Mr. Gent. During the course of the trial, there was a telephone conversation which was recorded when my client's husband called from the local jail. When I say the local jail, I mean the jail in Billings, Montana. My client was not yet incarcerated. She was back in California. She'd never set foot in Montana, had never seen the Billings jail or anybody from Billings before. Mr. Gonzales had called on a collect call from the Yellowstone County Detention Facility. I claimed both marital privilege, and the Court admitted the statement over my objection, saying that because there had been a warning on the jail telephone call, when you make a collect call from a detention facility, there's a warning saying this call may be recorded. Well, both my client and Mr. Gent's client speak Spanish as their primary language. They have very minimal English-speaking skills. And more importantly, my client wasn't on the telephone when the call was answered and taken at her home. It was another individual. Kennedy. That was the only ground the district court recited? I'm sorry? That was the only ground the district court recited as a basis for overruling the objection? It is, Your Honor. I know that opposing counsel cites other reasons in their brief, but the district judge decided that because there was a warning in the recorded telephone conversation, that the respective parties should not have had an expectation of privacy for marital communication. My argument against that is both that the warning was in a foreign language to them and that my client wasn't present on the telephone when the warning was given. Therefore, the marital communication should not be covered by the warning. And I tried to parallel this to a Miranda issue, because if a police officer gives Miranda warnings in a non-native tongue to a suspect, they are not considered adequate warnings. Well, that's a constitutional issue. True. But it's the same sort of issue. This is just a – this doesn't rise to – this is just an evidentiary issue, isn't it? True, but it's the same – the same reasoning should be applied. If the individual being warned about the issues is receiving the warning in a foreign tongue, they have no way of understanding or contemplating what the warning means. And as I said, in my case, my client wasn't even present on the telephone when the warning was given anyway. The government attempts to, in their opposing brief, attempts to classify any communications between the two spouses as being some furtherance of the conspiracy. Well, my client had no connection to the conspiracy other than what the government attempted to present through these communications. In other words, they're bootstrapping. They're trying to say that not only should these communications be admitted, but those communications are the very evidence which creates the conspiracy. Furthermore, after the judge let these communications in, DEA agent Gail Williams came in on rebuttal testimony and gave opinions as to what some of the words or the phrases meant. Now, mind you, this conversation took place in Spanish. It was translated so that the jurors in Billings, Montana, could understand them in English. Agent Williams took these now translated phrases, which contained relatively innocuous words, and offered his own opinions as to what some of these phrases meant, like what pesos and store meant. Now, I know that it's a longstanding principle that DEA or other drug-trained agents can offer testimony to explain what terms of the trade mean, such as bindles or shooting up or things like that. But that same standard or expertise does not relate to innocuous words that an ordinary juror should be able to completely understand and draw their own conclusions about. Things like store and pesos and pronouns like it are things that any layperson can hear, draw their own conclusions about. And if you allow a police officer to get up under the color of his authority and offer opinions about what these words mean, it invades the province of the jury. It sways the juror's outlook on the case because this person who's testifying supposedly has some degree of expertise, even though his training not only doesn't cover Spanish, it doesn't involve anything about what a store or a peso or a pronoun means. Well, but it comes, you know, I think from a long experience of, I assume, having listened to these kinds of conversations over the years. I mean, I've been involved in cases where, you know, those agents have testified about conversations involving, like, say, tires. Oh, yes, you know, don't forget to bring a dozen tires with you or something like that. Or candy. You know, it's an expert opinion as to the kind of veiled conversation that goes on, right? And the jury can accept it or reject it. He didn't say, you know, in this case, I know that's what the defendant meant, did he? That was his state of mind. He didn't do that. He said, I think this is what they were intending to reference. And at that point, it's nothing more than conjecture and speculation. It's something that's you know. Well, I wouldn't say it's speculation. It's opinion based upon long experience. Well, it's not based upon experience, Your Honor, because these terms are not something that he's been trained to identify. It's no more than what my opinion would be as to, you know, whether it's going to rain tomorrow. It's not based on his experience. Nonetheless. No foundation for it? No foundation given at all, Your Honor. He testified that he'd been an agent for several years, and I'm well aware of that. Was that your objection? Or was your objection that, you know, he's giving an opinion on the ultimate issue? My objection had to do with his opinion on the ultimate issue. I don't question his credentials. I'm just saying that his training had nothing to do with the issues to which he spoke of. And more importantly, I didn't think that the communication should have entered into the evidence in the first place, because this falls completely within the province of a marital privilege, and the reasons given. Were there other people there? Other people there in what? During the conversation? Telephone conversation? Not that I'm aware of. There was no evidence indicating that there was anybody with an earshot of the telephone conversation. There were other individuals home in the house in other rooms where my client was speaking on the phone, but other than that, no. And the way that the district judge reasoned. I thought you said that the husband didn't hear the warning because the phone was just handed to him after the warning. No, no, the wife, sir, was. Well, on either side, if there's a third person present, that makes a difference, doesn't it? My client's sister-in-law had answered the telephone initially. Mr. Gent's client spoke to her briefly, asked if his wife was home. She handed the phone to my client, and then the sister-in-law left the room. Is there evidence that she left the room? That was the testimony in court, Your Honor. I don't think the government ever challenged that issue. What about on the other side, where the two men were at least initially present? Is there evidence that the first one left the room? The first? The sister-in-law, sir? I don't know whether two men were present at the jail. As far as the evidence or testimony indicated, he had some privacy when he spoke on the phone to his wife. There was no one else standing there that I was aware of. With that, I would defer to Mr. Gent. May it please the Court, I'm Larry Gent. I'm appellate counsel for Francisco Gonzalez Betancourt, and I incorporate supplemental authority in briefs that have been filed by other counsel. After the Thomas decision, and the only decision we have so far in the circuit that cites Thomas is United States of America v. Patterson, it is crystal clear that the defendant could have pled guilty but contested the amount of drugs with which he could be sentenced. And this is what he tried to do. And since he did that, he accepted responsibility for the offense, since we know now that drug quantity is not an element of the offense. And therefore, this Court should remand this case for resentencing and assessment of the two points for acceptance of responsibility under the sentencing guidelines. His lawyer sentencing Wait a minute. In this case, the indictment charged an amount, right? The indictment charged more than 500 grams. That's right, Judge. And whatever plea offer there was didn't include an offer to plead to the truth of that quantity charge, right? That's right. I don't know what plea offers went back and forth, of course, because I wasn't counsel there. But basically, he was going to At the plea taking, he didn't say, he said he couldn't agree to the amount, right? That's right, Judge, but it doesn't make any difference. So he didn't agree to the amount. In fact, he was convicted of that amount, more than 500. He was convicted of more than 500 grams. In light of the fact of the offense for which he was actually convicted, how can you say it doesn't make a difference? Because, Your Honor, drug quantity is never part of an offense, and that is clear after Thomas, after Patterson. Drug quantity is an amount that matters at sentencing. The problem in those cases was exactly the problem that was overcome here, namely that in taking the plea, the judge didn't have the defendant admit to the amount, right? That's what happened to Thomas. The judge wanted him to plead to the truth. He had a finding beyond the reasonable doubt of the amount, so that cures the Thomas problem. But as far as whether he accepted responsibility for the offense, a drug trafficking offense with which he was charged, he did that. He admitted that he transported methamphetamine to Montana with the other people, and in doing so, he was guilty of a conspiracy. He's totally entitled to admit to a drug conspiracy, but yet contest the amount involved in that conspiracy at sentencing. To say, well, he got convicted of the amount in the offense ignores everything that was decided in Thomas and Patterson and, indeed, even in Blakely. It's not a Blakely issue per se, because he was convicted beyond a reasonable doubt. But all those cases read together in the proposition I'm trying to set forth that the court, as a defendant, can plead guilty to an indictment but contest the amount. Whether he has a plea agreement. If he has a plea agreement, he's found guilty beyond a reasonable doubt when the judge accepts a plea. If he goes to jury trial, he's found guilty beyond a reasonable doubt. And he can also be found guilty beyond a reasonable doubt by pleading guilty, whether it's at his initial appearance or at some point thereafter. In all of those cases, the defendant pleads guilty, and in doing so, under 3E1.1, accepts responsibility for a criminal offense. Well, but the way you're construing that guideline, he can plead guilty to any criminal offense. No, Your Honor, he can plead guilty to a criminal offense which he's been charged with because amount is not an element of the crime. But Buckley, I mean, that's what our case law says, right? Right. Right, so it's not an element of the offense. Hmm? The distinguished author. All right. The other issue that Mr., if there are no other questions on the sentencing guideline issue, the remaining issue is the fact that Judge Siebel found his letter to his wife where essentially he says, I bet you're glad I'm not hitting you anymore. In other words, admitting that he was a spouse abuser was prejudicial. He found that it was prejudicial before the government put on its case and told the government not to put it on in its case. And then allowed that letter in during the defendant's case. When he allowed it in, you or whoever the trial lawyer was didn't ask for a severance. He did not ask for a severance. But the judge could have severed the case sua sponte and counsel at the time could have objected, but neither of those things happened. And so the fact is, Your Honor, this was found by the judge to be prejudicial, but yet the jury that ultimately convicted him of the offense heard it. And under Rule 403, it should have been excluded. And that's why. Well, assuming it should have been excluded, the question is, was it prejudicial? Right? Yes, sir. What's your case for prejudice? One of the things you have to weigh is the strength of the government's case otherwise, right? Pretty strong case, isn't it? It is a pretty strong case, Judge. The trial judge said it was overly prejudicial. And I guess that's the most important authority that I have, that it was more prejudicial than probative, because the judge that heard the evidence and heard all the evidence, knew the evidence in the trial, called it overly prejudicial. Thank you, Your Honor. Thank you. We'll hear from the government. Good morning, Your Honor. My name is Bill Brown. I'm with the Appellate Section of the Criminal Division, Department of Justice, Washington, D.C., representing the government. Starting in the order that the appellants spoke, Appellant Carrasco raises a Blakeley issue. This was raised in a supplemental brief that was filed without a motion to permit such a thing. But I'm not contesting that. But it was filed. It purports to be a 28-J document, right? It's too long to be a 28-J. It does purport to be, but it also purports to be a supplemental brief. My point is not to object on the merits of the filing, but to say this was filed just before argument. And if the Court would permit, we would like an opportunity to respond in writing to that supplemental brief. And I'm just uncertain as to whether or not that should be. To the merits of the brief? I'm sorry? To the merits of that brief? To, yes, to that brief. Don't you think for that, it's better to wait until after Booker and Fanfan are decided? My next sentence was intended to be, I don't know whether the Court wants me to respond now, after Amelie. It makes sense, wouldn't it, to just. . . To hold off on that until after Booker. . . Either hold off or to send it back to the district court and let the district court do what may be called upon to do after Booker and Fanfan are decided. Since there may not be a need for a remand and the district court would have to wait anyway, I would suggest that it would be appropriate to hold it here. In fact, there are arguments that we could make. I do not know whether they apply here because we haven't responded to this formally. But this was not raised in the district court, so perhaps it's not plain error. Just for example, I. . . So, therefore, I would ask for the opportunity to respond at a time to be set by this Court. That's our request. And we can do it as you will. Turning to the issues raised on the merits, with respect to the telephone communication, Maria Duque-Torres argues that this was a confidential, protected by the marital privilege. The Court did not abuse discretion in admitting this evidence. Statements that are made before are likely to be overheard by third parties are not covered, of course, by the privilege. Is the evidence clear that it was overheard by third parties? No. Well, what we do have is . . . First of all, I do want to note our argument that the case law seems to establish that jailhouse communications are presumptively . . . Well, but see, those cases now pertain to the person in the jailhouse, don't they? Not to the person at the other end claiming . . . I think the cases I'm referring to talk about . . . Yes, if the person on the other end knows that the other person's in jail, they're talking about the general perception that jailhouse communications are monitored. But we don't have to . . . We're not stuck with just that, although those two or three cases should control . . . But let me just clarify that a little bit. Are you saying that the wife, she's in California, husband's in jail in Yellowstone, and she should know that the call is being monitored? That it may be monitored? Yes. And why is that? Why should she know? Because jailhouse telephone calls are monitored or may be monitored. And do you know that or not? I don't think the ordinary person on the street has ever thought of that. That's what the authority we cite. Is there a case like that in the Ninth Circuit that says that, we'll say presumption applies to everybody? No, there's not a Ninth Circuit case. We have the Maydot case in the Seventh Circuit, and it cites a couple other cases. But, again, we're not tied . . . Are there grounds or what? Perhaps more persuasive grounds are that it has to be a confidential communication. At the jailhouse, there were signs. In the conversation, there's an explicit advisory system. The inmate, when they're making the call, gets to choose between . . . There was an argument made about this was in English rather than Spanish. The inmate gets to choose whether the warning and advice thing comes across in English or in Spanish. Well, she's raising the objection, isn't she? She is? She wasn't in jail. I . . . yes, that's fine. She does . . . Yeah. The inmate told her husband, press that, okay? It goes to her. It comes across, and it actually is said on the line, subject to monitoring and recording. As you mentioned, somebody at their hands heard the phone. There's a couple points I want to . . . There's conversation . . . If you read the conversation itself, you will see what appears to be conversation about the system. That is, have them make the call in English. Duque, in fact, testified in her first, I don't know, ten questions or something were in English language. She has some familiarity with the English language. She's lived here. She testified partially in English. There are . . . Does that have to destroy the privilege that he knows that it's being monitored? I think so, because he's . . . it's confidential between the parties, and he's half of the parties he knows. But if you actually read that conversation, you will see that not only are they handing the phone back and forth between the . . . it's not . . . Counsel said that there was testimony that the person, the first person who handed the phone to her had left the room. I am not aware of any such testimony. No one who was in the room testified, to my knowledge. If you read the conversation, it appears that they're handing the phone back and forth and actually saying things to . . . at the prison, that Francisco is actually saying things that . . . that Sinopio can hear. And at the other end, they're handing the phone back and forth. At both ends? At both ends. Again, that's not totally clear, but it seems evident from reading it. But also . . . Can you show me a . . . do you have the transcript handy? Can you show me an example of that? Well, on page 816, there is a handing the . . . Page what? On page 816 of the trial transcript. Okay. There is a handing the phone. And immediately right before that is Maria saying, and this isn't directly relevant to your point, but says . . . Maria says, okay, remember to use English when you call, please. All right. Yeah, that's fine. The conversation is about . . . It's about 20 pages long, and I'm having a little trouble locating exactly that point. If you want me to, I will search through it, but I prefer to make some other points. Zero on here, take here. Yes, that shows that they were, you know, at least relatively handy. But I think there's even . . . I think the whole context of it implies, as they go back and forth, shows that they probably were not in another room, but they were closer by. And as I said, Duque . . . Duque-Torres did testify partially in English in her testimony at trial. Perhaps more importantly, the district court made the finding that they knew what they were doing with respect to . . . not just that the recording was on the recording. Of course it is, because it's recorded and it was transcribed. But the district court made a finding that they knew what they were doing in the operation of the system. And I think that can't be found to be clear error. And even if this was intended to be confidential, even if they were whispering in a back alley, it wouldn't be covered by the privilege, because it doesn't apply when they are partners in crime. The message itself includes the conversation about the storage, the store or the storage, and Elena . . . I'm sorry, Maria Duque-Torres says, don't worry, I got it out of there. Elena has it. That's a conversation about moving the drug stash and that's not covered by any sort of privilege, because they were both involved, they were both convicted. Counsel went on to attack Agent Williams' testimony regarding that conversation. As the court recognizes that given the attempts of drug dealers to disguise their conversations, it's routinely found in most cases that it's not true. It's not admissible for experienced law enforcement officers to give expert and lay opinion testimony about the meaning of a conversation. This was a very tame example of that. The agent here didn't . . . and he did not give meaning to the terms it. He did not give a meaning to the term peso. What he did in the context of it and peso was just in response to questioning from the prosecutor, pointed to those as areas, suspicious areas of the conversation. He didn't go beyond that to say that that's saying what they meant and invading the providence of the jury goes too far. He just said that these were veiled areas and that was in the context of the recording. He did give a meaning that the store she rented, this discussed in the conversation, referred to the storage room that she rented. That's not a surprising opinion that the storage room she rented was discussed in an interview between the law enforcement officers and Duque that was admitted into evidence. It was mentioned in a letter. There was no dispute that she had rented a storage room. The only dispute was what it was for. To identify the store she rented as a rented storage room was not significant to the case. Counsel, if the Court has no more questions about that area, I'll move on to counsel's argument that the Court should not have admitted the letter that Francisco sent to Duque Torres, which suggests domestic violence. I think the Court should be aware that prior to trial, the Court not only ruled that the government couldn't put in that portion of the letter, which was otherwise relevant, but that a defense counsel for Duque Torres raised it and said, well, he wanted to put it in because it was essential to his defense. And the Court ruled on like page 22 of the transcript before the trial had started, I'm sorry, 23 and 24 of the transcript, that if the defense wanted to put it in, he would because he wasn't going to prevent their defense. And yes, he ruled it was prejudicial. Evidence of spouse abuse is not helpful to a defendant. It wasn't relevant to the case. The question is, under 403, is its relevance substantially outweighed by its prejudicial value? I'm sorry, is its probative value substantially outweighed by prejudice? When the government was, for Duque Torres' purposes, it was relevant. It was highly relevant to her defense. It wasn't outweighed, certainly not substantially outweighed. And the Court, although it never ruled that it was, in fact, he ruled directly to the contrary, that its probative value was not substantially outweighed in the context of that. And he admitted it. And there's no abuse of discretion there. It wasn't used by the government in any way in the trial. On the acceptance of responsibility point, first of all, no acceptance of responsibility was even requested at trial. So we're here under a plain error standard. There certainly is nothing that could get to that here. In the other cases, McKinney, Rodriguez, other cases of this type where a plea has been thought to be, where the judge didn't give proper consideration to the plea, attempted plea of the defendant, those are cases where the defendants actually did manifest an acceptance of responsibility. In those cases, the defendants tried to or did confess and give information about their offenses immediately after the trial, after their arrest. Here, that was not true. He did not confess. In fact, he falsely denied guilt. He went to trial, and when he did plead guilty, he didn't want to plead to the charges that he was ultimately found guilty of. And even after his conviction, he did not admit guilt or remorse. What about the point that, well, he did plead guilty to the crime charged in the indictment, although he didn't plead guilty to the quantity? Because under our case law, quantity is not an element of the offense. Or not he did plead, but he was willing to plead. First point, that just pleading guilty or going to trial isn't decisive on acceptance of responsibility. Whether he wanted to plead guilty, even if he had wanted to plead guilty to the whole indictment, he isn't necessarily entitled to an acceptance of responsibility and vice versa. But I think what Thomas says is that when the judge allows a person to plead, without defining the quantity, that that's okay. That still counts as a plea. But I don't think Thomas says that you have the right to plead to a zero-quantity indictment or to something less than the jury will find. But whatever the nuances of that might be, it's certainly not plain error in a case where a person has manifestly not exhibited any acceptance of responsibility other than a partial attempt to plead. What does Blakely do to acceptance of responsibility? Just out of curiosity. Well, I think the government's position is it does nothing, because it doesn't affect the guidelines at all. But skipping past that, then it becomes a matter of, you can't really skip by that, because then it becomes a matter of severability. Do you count downwards and not things that go up? And technically, it wouldn't apply to it at all, because it's not, an acceptance of responsibility would never increase the defendant's maximum. So I guess my answer is ultimately, Blakely does nothing to acceptance of responsibility. Thank you. Anyone wish to add anything? You have about a minute and a half. Okay, that's fine. First of all, the district judge, when he ruled on the marital privilege issue, didn't examine anything about other people being in the room on either end of the telephone. The privilege was thrown out simply due to the fact that there was a warning on the recording. And in this case, I stick to my original argument, independent of any conjecture from appellate counsel for the government about other people being present in the respective rooms. I submit that because of the trial judge's rulings with respect to those warnings, that ruling is faulty simply due to the fact that the warnings were not given at the time my client was on the phone and that the warning given when Mr. Gent's client was on the phone was in a foreign tongue. I just wanted to clarify that. A foreign tongue? Well, in English, foreign to our respective clients. Does the transcript indicate that they were talking in English? No, they were both speaking in Spanish. The translation was given in court, and that's what Agent Williams commented on. Okay. But it was a Spanish conversation which had been translated for the jury's convenience. Okay. Thank you. The case just argued, matters just argued, are submitted for decision. And the court, before hearing the last case, because we're going to reconstitute the panel, will take a brief recess. Thank you. All rise. More telephone today. More telephone. Mr. Duke. Yes. Please stay on the line. We'll connect in Judge Bide's chambers in just a moment. Okay, very good. I'll stay on the phone. Thank you. Thank you. I've got a hundred and something. I am Washington Sun. I struggle with it. Thank you.
judges: Schroeder, Browning, Tashima